# United States Court of Appeals
## For the First Circuit

---

No. 22-1783

TBL LICENSING LLC, f/k/a The Timberland Company, and
subsidiaries (a consolidated group),

Petitioner, Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE,

Respondent, Appellee.

---

APPEAL FROM THE UNITED STATES TAX COURT

[Hon. James S. Halpern, U.S. Tax Court Judge]

---

Before

Kayatta, Lipez, and Gelpí,
Circuit Judges.

---

Shay Dvoretzky, with whom Christopher Bowers, Nathan Wacker, Parker Rider-Longmaid, Sylvia O. Tsakos, Hanaa Khan, Skadden, Arps, Slate, Meagher & Flom LLP, James Preston Fuller, and Fenwick & West LLP were on brief, for appellant.

Judith A. Hagley, Tax Division, Department of Justice, with whom David A. Hubbert, Deputy Assistant Attorney General, Tax Division, Department of Justice, Francesca Ugolini, Tax Division, Department of Justice, and Jacob Christensen, Tax Division, Department of Justice, were on brief, for appellee.

---

September 8, 2023

---

**KAYATTA**, <u>**Circuit Judge**</u>.    In 2011, TBL Licensing LLC ("TBL") transferred intangible property worth approximately $1.5 billion to an affiliated foreign corporation.  The transfer occurred in the context of a corporate reorganization involving an exchange as described in section 361 of the Internal Revenue Code.[1] TBL took the position that the tax attributable to the transfer could be paid over time on an annual basis by one of TBL's affiliates.  The IRS disagreed, assessing a deficiency based on the position that TBL itself was required to pay tax on the entire gain, and to do so in its tax return for the year of the transfer. TBL challenged the deficiency, the Tax Court sustained it, and TBL appeals.

The tax treatment of TBL's transfer of its intangible property turns on whether the final step of the reorganization was a "disposition following such transfer" as that phrase is used in section 367(d)(2)(A)(ii)(II).  As we will explain, we agree with the Commissioner that TBL's transfer of its intangible property was followed by a disposition of that property, requiring TBL to pay the tax due in a lump sum.

---

[1] All uses of "section" refer to sections of the Internal Revenue Code (26 U.S.C.) unless otherwise indicated.

**I.**

We begin with the basic terminology and background rules of federal income tax that help frame our reading of section 367(d).  A taxpayer generally "recognizes" gain on property that has increased in value when the taxpayer sells, exchanges, or otherwise disposes of the property.  <u>See</u> I.R.C. § 1001(a)-(c)(1991); <u>Cottage Sav. Ass'n</u> v. <u>Comm'r</u>, 499 U.S. 554, 559, 566.  To "recognize" gain simply means to take the gain "into account in computing income."  Boris I. Bittker & Lawrence Lokken, <u>Federal Taxation of Income, Estates and Gifts</u> ¶ 40.1 (2023).  So, in general, a taxpayer (including a corporation) that exchanges appreciated property for money or other valuable property recognizes the gain on the property as a result of the exchange.  The amount of the gain is the excess of the value of the money or property received in the exchange over the taxpayer's "basis" in the transferred property (typically, the cost of acquiring the property).  <u>See</u> I.R.C. §§ 1001(a), 1011(a), 1012(a).  These are the same rules that generally require individuals to pay income tax on the gain from selling stock.

The Internal Revenue Code, however, exempts certain corporate transactions from these general rules, allowing taxpayers to exchange property without recognizing any gain at the time.  While these "nonrecognition" provisions permit taxpayers to

avoid paying tax at the time of the transaction, the gain on the exchanged property does not forever escape taxation. Rather, as described further below, tax is deferred until a future disposition occurs that does not qualify for nonrecognition treatment. The policy underlying such nonrecognition rules is that it is inappropriate for an exchange to trigger tax where "the new property received is substantially a continuation of the old investment." Boris I. Bittker & James S. Eustice, <u>Federal Income Taxation of Corporations and Shareholders</u> § 12.00[1] (2020).

There are two types of nonrecognition transactions that are relevant to section 367(d): corporate formations under section 351 and corporate reorganizations under section 368.

Section 351 generally provides nonrecognition treatment when a person (i.e., a natural person or a corporation) or group of persons transfers property to a corporation in exchange for that corporation's stock, and such person or group is in "control" of the corporation immediately after the transaction (generally defined as owning at least 80% of the corporation's stock). <u>See</u> I.R.C. §§ 351(a); 368(c). A simple example of a section 351 exchange, in which two people each contribute property to a newly formed corporation, is depicted below:

<u>Section 351 Example</u>



Absent the special nonrecognition rules, those transferring property (the "transferors") to the corporation (the "transferee") would have to recognize gain on any appreciated property transferred. For example, if a person transfers $100 worth of land with a basis of $75 in exchange for $100 worth of stock, that transferor would ordinarily recognize $25 of gain. But, assuming the transaction qualifies under section 351(a),[2] no gain is recognized. Instead, the transferor in this example takes a "carryover basis" in the stock received -- that is, the transferor's basis in the stock is the same as its previous basis in the land ($75). <u>See</u> I.R.C. § 358(a). In accordance with the

---

[2] This example assumes that only stock is received for the property. Different rules apply when the transferor receives both stock and money (or other property) in exchange for the property transferred to the corporation. <u>See</u> §§ 351(b), 358(a), 362(a).

general purpose of the nonrecognition rules, the transferor's economic interest in the land has continued by virtue of the transferor's stock interest in the corporation that now owns the land. Taxation of the land's increased value is deferred until a future disposition.

The transaction at issue in this appeal was a corporate reorganization under section 368, rather than a corporate formation under section 351. Corporate reorganizations include a wide range of transactions in which existing corporations merge, divide, or otherwise transform. See Bittker & Eustice, supra, § 12.00[2]. The transaction here falls into a specific subset of reorganizations in which one corporation transfers assets to another in exchange for stock (an "asset reorganization"). As the parties agree, a basic asset reorganization proceeds in two steps (which may either actually occur or be deemed to occur for tax purposes): First, one corporation (the "transferor") transfers all its assets to another corporation (the "acquiror" or "transferee") in exchange for some portion of the acquiror's stock. Second, the transferor transfers the acquiror stock it just received to its shareholders and ceases to exist for U.S. tax purposes.[3] At the

---

[3] However, in "divisive" reorganizations described in section 368(a)(1)(D), the transferor generally transfers only a designated portion of its assets to the acquiror (which must be a subsidiary of the transferor corporation) and then continues operating -- rather than ceasing to exist -- following the

completion of the transaction, the acquiror owns the transferor's assets, the transferor no longer exists (at least for tax purposes), and the historic transferor shareholders own a portion of the acquiror's stock. A simple example of this type of transaction and its result is depicted below:



Asset Reorganization Example

---

distribution of the acquiror stock. <u>See</u> Bittker & Eustice, <u>supra</u>, § 12.26[1].

<u>Result</u>



Nonrecognition and carryover basis rules apply to this type of transaction as well.[4]  In the first step, under section 361(a), the transferor recognizes no gain on the exchange of its assets for acquiror stock.  As will become relevant later, we refer to this step as a "section 361 exchange."  The acquiror takes a carryover basis in the assets it receives (i.e., the same basis the transferor had in such assets).  <u>See</u> I.R.C. § 362(b). In the second step, under section 361(c), the transferor does not

---

[4]  As is the case with section 351, different rules apply when the transferor receives both stock and money (or other property) in exchange for the assets transferred to the acquiror.  <u>See</u> I.R.C. §§ 356(a), 358(a), 361(b), 362(b).

recognize any gain on the distribution of acquiror stock to its shareholders, and under section 354(a), the transferor's historic shareholders do not recognize any gain upon the receipt of acquiror stock (which they are treated as receiving in exchange for their transferor stock).  We refer to this step as the "second-step distribution."  The transferor's historic shareholders take a carryover basis in the acquiror stock they receive (i.e., the same basis they had in their transferor stock).  <u>See</u> I.R.C. § 354(a). When the dust settles, the historic transferor shareholders (by virtue of their stock in the acquiror) have a continuing economic interest in the transferor's historic assets -- and the recognition of any gain on those assets has been deferred until a future transaction, such as a sale of the assets by the acquiror.

As noted above, the nonrecognition provisions are premised in part on the fact that gain recognition is deferred to some future transaction.  Because the gain recognition is merely deferred, any gain not recognized upon the exchange of the transferor's assets for the acquiror's stock does not forever escape U.S. taxation.  But the involvement of foreign corporations in nonrecognition transactions undermines this premise, as foreign corporations are not generally subject to U.S. tax.  If the nonrecognition rules applied to a section 351 exchange or an asset reorganization involving a foreign corporation, there would be no

tax on the transfer of those assets to the foreign corporation (a so-called "outbound transfer"), and the foreign corporation would also owe no U.S. tax if it later sold those assets.

Section 367 addresses this concern. Section 367(a) provides that, in general: "If, in connection with any exchange described in section [351 or 361],[5] a United States person transfers property to a foreign corporation, such foreign corporation shall not, for purposes of determining the extent to which gain shall be recognized on such transfer, be considered to be a corporation." I.R.C. § 367(a)(1). In other words, section 367(a) provides that foreign transferees in property-for-stock exchanges are not to be treated as corporations. And since the nonrecognition rules of sections 351 and 361 only apply to exchanges involving corporations, section 367 renders those nonrecognition rules inapplicable to property-for-stock exchanges with foreign corporations.[6]

---

[5] Section 367(a) also applies to other corporate nonrecognition transactions not relevant here.

[6] Section 351(a) provides:

> No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation.

I.R.C. § 351(a) (emphasis added).

- 10 -

Without the benefit of a nonrecognition rule, the transferor must recognize gain on the transfer of the assets to the foreign corporation based on the value of the assets at the time of the transfer.  <u>See</u> I.R.C. § 1001.  Thus, section 367(a) prevents taxpayers from using the nonrecognition rules to transfer appreciated assets to foreign corporations and escape U.S. tax on the gain.

**II.**

With the foregoing terminology and background rules in mind, we turn now to section 367(d), the specific provision at the heart of this appeal.  Section 367(d) provides special rules (in place of the rules contained in section 367(a)) that apply to intangible property transferred by a U.S. person to a foreign corporation.[7]  It provides:

> **(d) Special rules relating to transfers of intangibles**
>
> **(1) In general**--Except as provided in regulations prescribed by the Secretary, if a United States

---

And section 361(a) provides:

> No gain or loss shall be recognized to a corporation if such corporation is a party to a reorganization and <u>exchanges property, in pursuance of the plan of reorganization, solely for stock or securities in another corporation a party to the reorganization</u>.

I.R.C. § 361(a) (emphasis added).

[7]  No amendments material to this appeal have been made to section 367 since the 2011 transaction, and thus all references are to the current version of section 367.

person transfers any intangible property to a foreign corporation in an exchange described in section 351 or 361--

>    **(A)** subsection (a) shall not apply to the transfer of such property, and

>    **(B)** the provisions of this subsection shall apply to such transfer.

>    **(2) Transfer of intangibles treated as transfer pursuant to sale of contingent payments--**

>    **(A) In general**--If paragraph (1) applies to any transfer, the United States person transferring such property shall be treated as--

>>    **(i)** having sold such property in exchange for payments which are contingent upon the productivity, use, or disposition of such property, and

>>    **(ii)** receiving amounts which reasonably reflect the amounts which would have been received--

>>>    **(I)** annually in the form of such payments over the useful life of such property, or

>>>    **(II)** in the case of a <u>disposition following such transfer</u> (whether direct or indirect), at the time of the disposition.

>>    The amounts taken into account under clause (ii) shall be commensurate with the income attributable to the intangible.

I.R.C. § 367(d)(1)-(2)(A) (emphasis added).

In simpler terms, if a U.S. person transfers intangible property to a foreign corporation in an exchange that would

otherwise receive nonrecognition treatment under section 351 or 361, then that person is treated as having sold the intangible property in exchange for certain taxable payments.  The timing of those payments depends on whether there is "a disposition following such transfer."  If there is no such disposition, then the payments are deemed to be received "annually . . . over the useful life of such property," I.R.C. § 367(d)(2)(A)(ii)(I), and must reflect "an appropriate arms-length charge for the use of the property."  Temp. Treas. Reg. § 1.367(d)-1T(c)(1).  But "in the case of a disposition following such transfer (whether direct or indirect)," the U.S. person is deemed to receive a lump-sum payment reflecting the value of the property "at the time of the disposition."  I.R.C. § 367(d)(2)(A)(ii)(II).  We refer to the former rule as the "annual-payment rule" and the latter rule as the "disposition-payment rule."

Before moving on to how section 367(d) applies in the context of an asset reorganization (the type of transaction relevant to this appeal), it is helpful to first understand how it works in the more straightforward context of a corporate formation under section 351.  As described above, the basic section 351 transaction involves the transfer of property by a person or group in exchange for corporate stock, where the person or group controls the corporation immediately following the transaction.  In the

purely domestic context, a person who transferred intangible property to a corporation in a section 351 transaction would not recognize any gain due to the nonrecognition rules provided by that section. But, if section 367(d) applied, the transferor would be treated as having sold the intangible property. Assuming no further transactions occurred after the conclusion of the section 351 exchange, the annual-payment rule would apply, and the transferor would be deemed to receive as income annual payments over the intangible property's useful life.

However, if within the intangible property's useful life the transferee corporation sells the intangible property to a third party (an uncontroversial example of a "direct" disposition under section 367(d)), or the transferor sells its stock in the foreign corporation to a third party (an uncontroversial example of an "indirect" disposition), then the disposition-payment rule would apply. The transferor would be treated as receiving as income a lump-sum payment based on the intangible property's value at the time of the disposition, and would no longer be treated as receiving the annual payments. See I.R.C. § 367(d)(2)(A)(ii)(II); Temp. Treas. Reg. § 1.367(d)-1T(d)(1), (f)(1).

The question at the center of this appeal is how section 367(d) applies to an outbound transfer of intangible property described in section 361. A section 361 exchange of the

transferor's assets for acquiror stock occurs in the broader context of an asset reorganization. This is distinct from a transfer under section 351, in which the exchange of the intangible property for stock can constitute the entirety of the transaction. As the parties here agree, every reorganization that involves a section 361 exchange of property for stock also includes, as a required second step, the distribution by the transferor of acquiror stock to the transferor's shareholders. This type of transaction poses the following question, the answer to which resolves this appeal: Is that second-step distribution a "disposition following such transfer" for purposes of triggering the disposition-payment rule?

### III.

Before answering that question, we summarize the specifics of the transaction that gives rise to this appeal.

In September 2011, VF Corp. (a domestic corporation) purchased -- through one of its foreign subsidiaries -- Timberland Co. (also a domestic corporation) for $2.3 billion in a transaction that is not directly at issue here. Approximately $1.5 billion of Timberland's value was attributable to its intangible assets. VF Corp. sits atop a multinational chain of corporations, and, following the acquisition, it undertook a variety of corporate restructuring transactions. As a result, TBL -- a domestic

corporation for U.S. tax purposes whose ultimate owner was VF Corp. -- acquired Timberland's intangible property (the "Timberland IP"). Then, in the transaction at issue here, TBL was deemed (for tax purposes) to transfer the Timberland IP to a foreign corporation and subsequently cease to exist.

Immediately prior to that transaction, TBL was directly owned by VF Enterprises S.a.r.l. ("VF Foreign"), a Luxembourg corporation. VF Foreign was indirectly owned (through a chain of foreign corporations) by Lee Bell, Inc., a domestic corporation that was in turn ultimately owned by VF Corp. As a result of the transaction, TBL Investment Holdings ("TBL Foreign"), a foreign indirect subsidiary of VF Corp., acquired the Timberland IP.

The parties agree that, for tax purposes, the transaction constituted an asset reorganization[8] in which the following two steps were deemed to occur: First, TBL transferred its assets (including the Timberland IP) to TBL Foreign in exchange for TBL Foreign stock; and then, second, TBL distributed the TBL Foreign stock to VF Foreign and ceased to exist for U.S. tax purposes.[9] The transaction and its result are depicted below:

---

[8] Specifically, the transaction constituted a reorganization described in section 368(a)(1)(F), which is defined as "a mere change in identity, form, or place of organization of one corporation, however effected." I.R.C. § 368(a)(1)(F).

[9] The IRS describes a deemed third step, in which VF Foreign exchanged its TBL stock for TBL Foreign stock. See Treas. Reg. § 1.367(a)-1(f)(1)(iii). TBL does not dispute that this deemed



The Transaction

---

third step occurred; but, because this step is not central to the resolution of this appeal, we have simplified the transaction into the two steps described above.

Result



TBL, which ceased to exist for U.S. tax purposes as a result of the transaction, did not report any gain attributable to the Timberland IP transfer on its final tax return. Instead, VF Corp. took the position that the disposition-payment rule had

not been triggered, and that Lee Bell, Inc. -- as "the closest-related[10] U.S. entity to TBL" -- could report the income based on the annual-payment rule of section 367(d).[11]

On May 11, 2015, the IRS issued a notice of deficiency to TBL for the 2011 tax year, informing TBL of an income tax shortfall of about $505 million attributable to the transfer of the Timberland IP to TBL Foreign.  The notice stated that TBL should have reported the full amount of gain on the intangible-property transfer -- about $1.5 billion -- on its final tax return pursuant to the disposition-payment rule.  TBL petitioned the Tax Court for redetermination of the deficiency, asserting that it had appropriately applied the annual-payment rule by including the deemed payments in Lee Bell's income.

The Tax Court granted summary judgment to the Commissioner in January 2022, sustaining the deficiency.  As is relevant here, the court analyzed whether there had been a "disposition following such transfer (whether direct or indirect)" -- i.e., whether the conditions for triggering the disposition-payment rule had been satisfied.  The court first

---

[10]  In this context, a "related entity" generally refers to a major (direct or indirect) shareholder.  See I.R.C. § 267(b); Treas. Reg. § 1.367(d)-1T(h).

[11]  Between 2011 and 2017, Lee Bell reported more than $475 million in income attributable to the transfer.

concluded that TBL's distribution of TBL Foreign stock to VF Foreign constituted an "indirect" "disposition" of the Timberland intangible property because the transferor of the intangible property -- TBL -- relinquished its interest in the foreign corporation that owned the intangible property -- TBL Foreign. Next, the court concluded that the phrase "following such transfer" simply means following the transfer of the intangible property. Accordingly, the court held that the disposition-payment rule applied because TBL's distribution of TBL Foreign stock constituted a "disposition following" TBL's "transfer" of the Timberland IP to a foreign corporation. TBL timely appealed.

## IV.

TBL principally argues that, in the event of an asset reorganization involving the outbound transfer of intangible property, the disposition-payment rule does not apply unless there is a disposition following the overall asset reorganization (which TBL calls a "[section] 361 reorganization"[12]). In accordance with this position, TBL maintains "that the word 'transfer' in 'a disposition following such transfer,' means the completed [section] 351 transaction or [section] 361 reorganization." Therefore, reasons TBL, the distribution of TBL Foreign stock to

---

[12] We prefer the term "asset reorganization," as nonrecognition rules beyond those contained in section 361 apply to such transactions. See I.R.C. §§ 354, 356.

VF Foreign was the completion of the relevant transfer (i.e., the overall reorganization), and not a post-transfer disposition triggering the disposition payment rule. The Commissioner, in contrast, argues that the relevant "disposition" need only follow the "transfer" of the intangible property (rather than the overall reorganization), which is exactly what happened here when TBL distributed TBL Foreign stock after transferring the Timberland IP.

To resolve this dispute, "we start with the text of the statute," Babb v. Wilkie, 140 S. Ct. 1168, 1172 (2020), and then address TBL's arguments regarding legislative history and the relevance of the section 367(d) regulations. In so doing, we review the Tax Court's interpretation of section 367(d) de novo. See Benenson v. Comm'r, 887 F.3d 511, 516 (1st Cir. 2018).

### A.

### 1.

From the outset, TBL's argument finds no toehold in the statutory text. The general rule of section 367(a) casts its net around transactions in which "a United States person transfers property to a foreign corporation" "in connection with any exchange described in section [351 or 361]." I.R.C. § 367(a). An "exchange described in section . . . 361," id., is generally an exchange by one corporation (that is a party to a reorganization) of property

for stock in another corporation (that is also a party to the reorganization) made "in pursuance of the plan of reorganization." I.R.C. § 361(a).  Put more simply, in the context of a section 361 exchange, the object of section 367(a) is the transfer of property to a foreign corporation in connection with an exchange made in pursuance of a plan of reorganization.  The object is not the distribution of stock that necessarily must follow the section 361 exchange.  The first step of the TBL asset reorganization exactly fits this description: In pursuance of a plan of reorganization, TBL (a United States person) transferred property to TBL Foreign (a foreign corporation) in exchange for TBL Foreign's stock.

It is thus clear that TBL's transfer of its property to TBL Foreign neatly falls within the reach of the section 367(a) general rule.  And by deeming TBL Foreign not to be a corporation, that general rule would require TBL to recognize and pay as a lump sum a tax on the transfer.  Not surprisingly, TBL therefore acknowledges that it must qualify under an exception to that general rule if it wants to have a different treatment.

Section 367(d)(1) creates the only relevant exception, which applies when "a United States person transfers any intangible property to a foreign corporation in an exchange described in section 351 or 361."  I.R.C. § 367(d)(1).  Section 367(d)(2) in turn spells out the required tax treatment if "[section 367(d)(1)]

applies to any transfer."  I.R.C. § 367(d)(2).  TBL claims to qualify for such treatment, based on the position that it transferred intangible property to TBL Foreign in an exchange described in section 361.  And the IRS agrees that TBL did make such a transfer.  Hence, both parties agree that TBL escapes the general rule of section 367(a) and that the tax treatment of its transfer of intangible property is to be found instead in section 367(d)(2).  Exactly how section 367(d)(2) applies to TBL's transfer is the nub of the parties' dispute.

What should be clear from the foregoing is that the term "such transfer" in the disposition-payment rule of section 367(d)(2) ("in the case of a disposition following such transfer") has only one possible antecedent.  That antecedent is the "transfer" that is the express object of both the general rule of section 367(a) and the exception of section 367(d) in which TBL seeks haven.  That is to say, it is the transfer of intangible property to TBL Foreign, not the asset reorganization as a whole. See IBP, Inc. v. Alvarez, 546 U.S. 21, 34 (2005) (stating that under "the normal rule of statutory interpretation," "identical words used in different parts of the same statute are generally presumed to have the same meaning," and further concluding that an "explicit reference to the use of the identical term" earlier in the statute by use of the phrase "said [term]" confirms consistent

meaning).  And the fact that section 367 elsewhere uses the term "reorganization," see I.R.C. § 367(a)(2), demonstrates that Congress knew how to say "reorganization" when it meant it.

TBL's response pays little heed to the statutory text. TBL maintains that we cannot characterize an outbound transfer of intangible property as having been part of "an exchange described in section . . . 361," I.R.C. § 367(d)(1), until the overall reorganization is complete.  TBL, in turn, asserts that section 367(d) does not "kick in" -- i.e., the conditions required for its application are not met -- until the reorganization is completed at the time of the second-step distribution.  And if that is so, reasons TBL, the second-step distribution cannot serve as the relevant trigger for the disposition-payment rule. Otherwise, the disposition-payment rule would be triggered at the same time that section 367(d) in general kicks in, which in TBL's view apparently could not be so.  There are two glaring defects with this argument.

First, and most simply, we need not wait until a reorganization is complete to determine whether a particular exchange is described in section 361.  Section 361(a) generally applies when the transferor "exchanges property, in pursuance of the plan of reorganization, solely for stock" in the acquiror. I.R.C. § 361(a) (emphasis added).  Nothing in this language or the

- 24 -

language of section 367(d) suggests that the pursued plan of reorganization need be complete in order to view the transfer of intangible property as occurring in "an exchange described in section . . . 361."[13]  I.R.C. § 367(d)(1); see Bittker & Eustice, supra, § 12.02[6].  Section 367(d), therefore, does "kick in" before the planned reorganization is complete.

Second, even if TBL were correct that one must await the completion of the reorganization before deeming the transfer of the assets to have occurred in a section 361 exchange, it would still be clear that the belatedly classified transfer occurred when it did, i.e., before the second-step distribution. So, TBL's view that the taxpayer must wait until the conclusion of the transaction to finally determine whether and how section 367(d) applies is not at all inconsistent with the plain-text reading of "such transfer" we outlined above.

Trying out another theory, TBL argues that an asset reorganization "must be understood as a consistent whole, from initial asset transfer until after the stock is distributed to shareholders," and thus there is no part of the reorganization "that can serve as 'a disposition following such transfer.'" Accordingly, TBL asserts, "[a] 'disposition following' must refer

---

[13] Of course, we do not suggest that the IRS could not recharacterize a previous transaction if a future step necessary to the plan of reorganization never ended up occurring.

to something that happens after" the completed reorganization. But simply because separate steps of an asset reorganization form part of a unified whole does not mean section 367(d) cannot reference one of those steps individually.  The phrase "exchange described in section . . . 361" refers to the first step of an asset reorganization, and, as elaborated further below, TBL does not argue otherwise.  So it is entirely unclear why the term "such transfer" as used in the disposition-payment rule could not also refer to that same individual step.

For similar reasons, we reject TBL's attempt to ground its argument in Commissioner v. Clark, 489 U.S. 726 (1989), which held that "interrelated yet formally distinct steps in an integrated transaction may not be considered independently of the overall transaction."  Id. at 738.  Here, we certainly treat the second-step distribution of TBL Foreign stock as part of the overall plan of reorganization; without that step, the transfer of the Timberland IP would not qualify as a section 361 exchange, and we would have no occasion to be discussing section 367(d) at all. But the fact that distinct steps are "interrelated" does not mean that all distinctions between those steps are erased.  For example, we know that the two steps occur at different times (one after the other, rather than simultaneously), and that different provisions

of the Internal Revenue Code operate to grant nonrecognition treatment to each step.  See, e.g., §§ 361(a), 361(c), 354.

Relatedly, TBL argues in its reply brief that because section 367(d) refers to "section . . . 361" as a whole -- rather than those specific provisions of section 361 that apply to section 361 exchanges -- the relevant disposition must necessarily occur after the completed reorganization.  Recall that section 361(a) provides nonrecognition treatment for the transferor in a basic section 361 exchange of property for stock. Further, when the transferor receives both stock and money (or other property) in exchange for the property transferred to the acquiror, section 361(b) applies to the exchange instead of section 361(a).  Section 361(c), in contrast, applies to the second-step distribution rather than the first-step exchange, generally providing nonrecognition treatment for the distribution by the transferor of the acquiror's stock.  And so, TBL argues, the reference to section 361 in section 367(d) -- rather than to section 361(a) or section 361(b), specifically -- "mean[s] the entire [section] 361 reorganization must occur to trigger [section] 367(d) before the statute asks if there has been a 'disposition following' that reorganization."  As TBL puts it, "when Congress wanted to provide rules for specific steps of a § 361 reorganization, it cross-referenced the subsections

associated with those particular steps," pointing to a provision within section 367(a) that does specifically refer to "an exchange described in subsection (a) or (b) of section 361." I.R.C. § 367(a)(4).

This argument does little to move the needle. TBL does not frame its position as arguing that an "exchange described in section . . . 361," as used in section 367(d)(1), refers to the overall reorganization. Instead, we are left with the conclusory assertion that the use of "section 361" rather than its more specific subsections ipso facto tips the scales in TBL's favor.[14] Further, any argument that the relevant "exchange" refers to the overall reorganization would sit in direct tension with TBL's earlier recognition in its opening brief that that term refers to a section "361 exchange" rather than, as TBL calls it, a section "361 reorganization." As noted above, the first-step exchange in an asset reorganization qualifies for section 361 nonrecognition treatment so long as the exchange is in pursuance of a plan of reorganization that involves a second-step distribution. The fact that a second-step distribution must follow

---

[14] The fact that section 361 did not address distributions of acquiror stock until 1986, two years after section 367(d)'s enactment, further diminishes the force of TBL's point. See I.R.C. § 361 (1982); Tax Reform Act of 1986, Pub. L. No. 99-514, § 1804(g), 100 Stat. 2085, 2805-06.

does not transform the word "exchange" into a term describing the reorganization as a whole.

A separate aspect of section 367(d) further undermines TBL's argument.  The text indicates a clear expectation that it is the U.S. transferor of the intangible property, and not some other party in the corporate chain, that must account for the income arising from the transfer.  Granted, section 367(d) does not explicitly require the U.S. transferor to be the entity that recognizes the gain under that section, but it comes awfully close.  Section 367(d)(2)(A) states that it is the U.S. transferor that is "treated as" "having sold" the intangible property and "receiving" the deemed payments from that sale.  I.R.C. § 367(d)(2)(A)(i)-(ii).  Additionally, section 367(d)(2)(B) -- which addresses the effect of the section 367(d)(2)(A) deemed payments on the earnings and profits[15] of the foreign corporation that received the intangible property -- provides that such foreign corporation's earnings and profits "shall be reduced by the amount required to be included in the income of the transferor of the intangible property under [the annual-payment or disposition-payment rules]."

---

[15]    The term "earnings and profits" (E&P) refers to the pool of money out of which a corporation pays taxable dividends to its shareholders.  See I.R.C. § 316(a); Bittker & Eustice, supra, § 8.03[1].  This concept is relevant here only insofar as corporations must keep track of earnings and profits, and make the adjustments required under the Internal Revenue Code.

I.R.C. § 367(d)(2)(B) (emphasis added). Although this provision is not directly addressed to the U.S. transferor, it at the very least strongly implies that the statute's drafters intended that the deemed payments under either rule would be included in the U.S. transferor's income.

And if, as the text suggests, the U.S. transferor must account for such payments, then TBL's reading of the disposition-payment rule would be entirely unworkable. Recall that, in most types of asset reorganizations -- including the one at issue here -- the U.S. transferor ceases to exist as a result of the transaction.[16] Plainly in such circumstances the U.S. transferor could not include any amounts under the annual-payment rule in its income after the transaction. So, in a typical asset reorganization, the only way that the U.S. transferor could include the required section 367(d) gain is through the disposition-payment rule -- by including a lump-sum gain in its income just before it disappears. And that is exactly what results from giving the term "such transfer" its ordinary meaning based on the statute's plain text.

**2.**

Of course, "the words of a statute must be read in their context and with a view to their place in the overall statutory

---

[16]   See _supra_ note 3 and accompanying text.

scheme." See Util. Air Regul. Grp. v. EPA, 573 U.S. 302, 320 (2014) (quoting FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133 (2000)). Thus, to confirm our reading of "such transfer," we examine section 367(d)'s broader role within the structure of section 367.

As TBL stresses repeatedly, Congress, in enacting section 367(d), expressed a view that the annual-payment rule is "the most accurate way of assessing the value" of intangible property and is thus the preferred method of taxing the gain on outbound transfers of such property. TBL argues that only its reading "gives full effect" to the annual-payment rule by having the rule broadly apply to asset reorganizations; the Commissioner's reading, in contrast, would result in lump-sum treatment at the conclusion of every asset reorganization. Relatedly, TBL contends that if the Commissioner's reading of section 367(d) were right, "it would mean that Congress chose an awfully roundabout way to write the statute."

On this last point, we agree with TBL. Recall that every reorganization involving a section 361 exchange has, by definition, a disposition at the end of the reorganization. This means that every asset reorganization will have a section 361 exchange followed by a disposition. So the lump-sum, disposition-payment rule will arguably always apply (putting aside the

application of regulations to the contrary).  That is to say, under the Commissioner's reading, section 367(d) creates an exception to the general lump-sum rule of section 367(a) by calling for annual payments, and then essentially creates an exception to that exception, the operation of which -- in the context of asset reorganizations -- simply returns the taxpayer to the general rule.

So it is true that the Commissioner's reading of section 367(d) as applied to asset reorganization more or less takes with one hand what it gives with the other.  On the whole, though, we find that fact insufficient to warrant our "interpreting" the statute in a manner that would at the very least border on re-writing its plain language.  Our reasons are several.

First, it is not entirely clear that the annual-payment rule would not apply to at least some asset reorganizations.  As the Commissioner points out, the annual-payment rule still applies to any section 361 exchange that occurs in a tax year different from the second-step distribution, with the annual-payment rule applying in the tax years preceding the distribution.  TBL does not dispute that the second-step distribution can occur "months or even years" after the section 361 exchange.  So while the Commissioner does not argue that such multiyear reorganizations

are typical, there is still at least some work for the annual-payment rule to do with respect to section 361 exchanges.[17]

Second, this is not a case in which the Commissioner's reading treats any provision of the statute as surplusage. Eliminating the reference to section 361 in section 367(d) would have a substantive effect on the rules governing outbound transfers of intangible property. And this remains true even if one puts multiyear reorganizations aside. Section 367(d)(2)(C) specifically treats the gain from intangible property as ordinary income rather than more taxpayer-favorable capital gains (regardless of whether the annual-payment or disposition-payment rule is used). If section 361 were omitted from section 367(d), then, under section 367(a), the transferor would recognize the full amount of the gain upon the transfer of the intangible property (as would occur under the disposition-payment rule upon the second-step distribution), but no provision within that section would require ordinary-income treatment of that gain.

---

[17] TBL argues that multiyear reorganizations would not trigger the annual-payment rule because there is no section 361 exchange "to trigger [section] 367(d) at the time of the first step" until the reorganization is completed in the second step. As discussed above, this is a plain misreading of section 361. Section 361(a) requires the property-for-stock exchange to be "in pursuance of the plan of reorganization." The second-step distribution need not occur in the same tax year as the first-step exchange for that exchange to be considered in "pursuance of the plan."

Accordingly, the inclusion of section 361 exchanges in section 367(d) has clear import even beyond the application of the annual-payment rule to the multiyear reorganizations discussed above.  We thus reject TBL's argument that only its reading gives the statute's terms their proper effect, and we remain unpersuaded that the statute's somewhat odd structure compels us to read "such transfer" in a manner different from what the plain text dictates.

Third, and most importantly, if the disposition-payment rule were not triggered by the second-step distribution in an asset reorganization, U.S. transferors could completely escape taxation under section 367.  To see why this would be so, it is helpful to first understand how VF Corp. reported amounts attributable to the annual-payment rule following the transaction here.  Given that TBL ceased to exist for U.S. tax purposes as a result of the transaction, TBL plainly could not take into account any deemed annual payments due in later years.  Instead, VF Corp. took the position that Lee Bell -- one of VF Corp.'s domestic subsidiaries and "the closest-related U.S. entity to TBL" (at the time TBL ceased to exist) -- could take the payments into account, essentially stepping into TBL's shoes.  TBL justifies this position based on the interaction of section 367(d) with a set of international tax rules known as "subpart F."  See I.R.C. §§ 951, 952.  For purposes of this opinion, we need not delve into the

details of this justification.  We assume that, if TBL's reading of section 367(d) were correct, then Lee Bell's reporting would have been proper.[18]

What is important for purposes of this discussion is not what Lee Bell did, but what would have happened under TBL's own understanding of the statute if TBL had no major U.S. shareholder in its ownership chain at the time of the transaction (e.g., if TBL were widely held rather than wholly owned, or if TBL were part of a foreign-only corporate structure).  Keep in mind that in an asset reorganization as here, the domestic transferor (TBL) ends its tax existence in the year in which the reorganization is completed.  So if it does not pay taxes on the appreciated intangible property as due that year, it will not be around to make any annual payments.  And without a domestic Lee Bell equivalent, there would be no U.S. taxpayer for the IRS to hold responsible for the deemed annual payments, rendering section 367(d) entirely ineffective.

As the overall text and structure of section 367 makes clear, and as our discussion of legislative history, infra, confirms, preventing just such a result was the central purpose of section 367.  Accepting TBL's reading of section 367(d) would

---

[18]  Of course, we reject any argument that we should adopt TBL's reading of section 367(d) simply because Lee Bell was available to foot the bill.

- 35 -

directly undermine the statute's core purpose: ensuring that the corporate nonrecognition rules are not abused to avoid U.S. tax. Clearly, Congress did not intend such a result. However important one thinks applying the annual-payment rule is, the statute's central aim is preventing appreciated assets from entirely escaping U.S. tax.

TBL does not contest that its reading would invite corporations to eliminate tax liabilities associated with gains on intangible property. TBL's primary rejoinder is that the Treasury Department could plug up the resulting massive loophole by promulgating regulations excepting from section 367(d) asset reorganizations in which the transferor had no related U.S. entity to absorb the annual payments, and placing such transactions within the general rule of section 367(a).[19]   But that argument fails to

_____

[19] In 2012, the Treasury Department issued a notice proposing regulations that would have provided, among other things, that the transferor's distribution of foreign acquiror stock to a foreign shareholder in the final step of an asset reorganization would trigger the disposition-payment rule.  See I.R.S. Notice 2012-39, 2012-31 I.R.B. 95.   TBL points to this notice as proof of "Treasury's understanding" that the statute, standing alone, "doesn't require a lump-sum payment here."  However, the notice explicitly states that "[n]o inference is intended as to the treatment of transactions described in this notice under current law."  Second, and relatedly, the issuance of clarifying guidance does not mean that the statute, standing alone, does not already yield such a result.  Third, the notice covers situations well beyond the scope of the transaction here, including circumstances in which the asset reorganization involves cash payments, so Treasury was doing more than simply addressing a question already covered by the statute.

address why Congress would have written a law that required immediate regulation to prevent such an obvious method of escaping U.S. tax.

TBL also responds that the Commissioner failed to identify any examples of taxpayers attempting to avoid U.S. tax in this manner.  However, it seems entirely possible that the IRS has not encountered any such scenarios because the risk of taking such a position is apparent to most sophisticated taxpayers on the face of the statute.

Having examined the disposition-payment rule within the broader context of section 367, we thus find little support for TBL's contention that "such transfer" refers to the overall asset reorganization rather than -- as the plain text indicates -- the transfer of intangible property "to a foreign corporation in an exchange described in section 351 or 361."  I.R.C. § 367(d)(1).

**B.**

TBL also urges us to look to legislative history to find support for the proposition that only a disposition following the overall asset reorganization can trigger the disposition-payment rule.  For the foregoing reasons, the statutory text seems clear enough in context to preclude recourse to legislative history for the purpose of supporting a result at odds with the text.  <u>See</u> <u>Penobscot Nation</u> v. <u>Frey</u>, 3 F.4th 484, 491 (1st Cir. 2021) (en

banc).  Nevertheless, even assuming (without deciding) that some relevant ambiguity remains following our discussion above, we see nothing in the legislative history that could tip the scales in TBL's favor.

The earliest version of section 367 was enacted as section 112(k) of the Revenue Act of 1932, Pub. L. No. 72-154, § 112(k), 47 Stat. 169, 198.  That version of the law, like the modern one, provided (with one major caveat) that foreign corporations would generally not be treated as corporations for purposes of various nonrecognition provisions.  See id.; Bittker & Eustice, supra § 15.80[2].  But, unlike under today's law, foreign corporations would be treated as corporations in nonrecognition transactions if, prior to the transaction, the taxpayer established to the satisfaction of the Commissioner that the transaction was "not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes." Revenue Act of 1932, § 112(k).

This principal-purpose test and administrative ruling framework continued (with various tweaks along the way) until Congress passed the Tax Reform Act of 1984 (the "1984 Act"), Pub. L. No. 98-369, § 131, 98 Stat. 494, 663-64.  See Bittker & Eustice, supra § 15.80[2]-[5].  That law replaced the administrative ruling regime with objective statutory rules that operated to deny

nonrecognition treatment to certain categories of assets, while granting nonrecognition treatment to others. Id.; Bittker & Eustice, supra § 15.80[5]. Most relevant to this appeal, the 1984 Act enacted section 367(d) in substantially its current form, creating the new special rules for intangible property transferred in section 351 and 361 exchanges.

TBL attempts to portray Congress in 1984 as focused on switching from a system of immediate gain recognition for outbound intangible-property transfers to the annual-payment rule. Thus, TBL argues, we should hesitate to read section 367(d) in a way that precludes application of the annual-payment rule for most section 361 exchanges. But, as described above, the 1984 amendments did more than simply add the annual-payment rule to section 367. Indeed, nothing in the legislative history suggests Congress was particularly focused on the annual-payment versus disposition-payment dichotomy, let alone had a view that the disposition-payment rule should not apply to dispositions that occur as part of asset reorganizations.

Rather, the House report for the 1984 amendments to section 367 -- in a discussion regarding the "[r]easons for [c]hang[ing]" the tax treatment of "[t]ransfers of intangibles" -- appeared focused on making sure intangible property was taxed at all in outbound transfers. See H.R. Rep.

- 39 -

No. 98-432, at 1316; see also S. Prt. No. 98-169, at 360-61 (containing the same explanation). The report explained, "[i]n light of [the IRS's] favorable ruling policy" under the old regime "for transfers of patents and similar intangibles for use in an active trade or business of the foreign [transferee] corporation," "a number of U.S. companies have adopted a practice of developing patents . . . in the United States" and then transferring them abroad once "ready for profitable exploitation." Id. "By engaging in such a practice, the transferor U.S. companies hope to reduce their U.S. taxable income by deducting substantial research and experimentation expenses associated with . . . the development of the transferred intangible and, by transferring the intangible to a foreign corporation at the point of profitability, to ensure deferral of U.S. tax on the profits generated by the intangible." Id. The amendments sought to end this practice by ensuring all outbound transfers of intangible property would trigger U.S. tax.

While, of course, Congress must have believed there were advantages to taxing intangible property on an annual rather than lump-sum basis -- otherwise it would not have written section 367(d) as it did -- the legislative history does not provide much evidence that Congress was particularly concerned about this distinction. TBL misleadingly explains that "the Joint Committee on Taxation estimated that the switch to the annual-

payment rule for intangible property would increase IRS tax collection by over $1 billion within five years." But that $1 billion figure represented the total increase in revenue from all the 1984 amendments to section 367, not just from a supposed "switch" from lump-sum taxation of intangible property to annual payments. See Joint Comm. Taxation, General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984, JCS-41-84, at 1242 (1984).

The closest TBL comes to support in the legislative history is a House report on the Tax Reform Act of 1985 that includes a description of section 367(d) as enacted the year prior. TBL cites the following excerpt from that report: "In general, the amounts are treated as received over the useful life of the intangible property on an annual basis. Thus, a single lump-sum payment, or an annual payment not contingent on productivity, use or disposition, cannot be used as the measure of the appropriate transfer price." H.R. Rep. No. 99-426, at 422 (1985). TBL argues that this description demonstrates that the annual-payment rule applies after an asset reorganization. But the report simply describes the general rules under section 367(d), and does nothing to indicate that Congress intended the annual-payment rule to apply to transactions like the one before us. Further, in the sentence immediately preceding the portion TBL cites, the report refers to

the deemed payments as "amounts included in income of the transferor," adding to the evidence that Congress did not intend the annual-payment rule as phrased in the statute to apply in instances when the original transferor liquidated.

Even stronger evidence of Congress's intent in this regard comes from the conference report for the Tax Reform Act of 1984. See All. to Protect Nantucket Sound, Inc. v. U.S. Dep't of Army, 398 F.3d 105, 110 (1st Cir. 2005) ("The most dispositive indicator of congressional intent is the conference report." (quoting United States v. Commonwealth Energy Sys. & Subsidiary Cos., 235 F.3d 11, 16 (1st Cir. 2000))). In describing the mechanics of the disposition-payment rule, the conference report states: "The conferees intend that disposition of (1) the transferred intangible by a transferee corporation, or (2) the transferor's interest in the transferee corporation will result in recognition of U.S.-source ordinary income to the original transferor." H.R. Rep. 98-861, at 955 (1984) (Conf. Rep.) (emphasis added). This statement appears to confirm what the statute already strongly indicates -- that it is the original U.S. transferor of intangible property, not some other entity in the corporate structure, that must recognize gain under section 367(d). The only way to achieve this in most types of asset reorganizations -- in which the U.S. transferor ceases to

exist for U.S. tax purposes -- is for the second-step distribution to trigger the disposition-payment rule, causing the U.S. transferor to recognize gain under that rule before it disappears. TBL's reading is plainly inconsistent with that mandate.

### c.

Finally, TBL argues that the tax position it took here is consistent with the Treasury Department's own understanding of section 367(d) as articulated through regulations, and that consequently, the Commissioner's "position in this litigation pulls the rug out from under taxpayers." Notably, however, TBL has abandoned its argument made to the Tax Court that the regulations directly apply to the transaction at issue here. But according to TBL, "that's not the point": "The regulations are relevant not because they directly apply to the particular facts of [this] case, but because their very premise is that [section] 361 exchanges are subject to the annual-payment[] rule unless a disposition occurs after the reorganization."

Nothing in the regulations, adopted in relevant part in 1986, reveals any such understanding. See Income Taxes; Transfers of Property by U.S. Persons to Foreign Corporations, 51 Fed. Reg. 17,936, 17953-56 (May 16, 1986) (codified at Temp. Treas. Reg. § 1.367(d)-1T). TBL first points to Temp. Treas. Reg.

§ 1.367(d)-1T(c)(1).      That    section    essentially    parrots
section 367(d), providing:

> If a U.S. person transfers intangible property
> that is subject to section 367(d) and the
> rules of this section to a foreign corporation
> in an exchange described in section 351 or
> 361, then such person shall be treated as
> having transferred that property in exchange
> for annual payments contingent on the
> productivity or use of the property.

Temp. Treas. Reg. § 1.367(d)-1T(c)(1).     TBL asserts that the
transferor "shall be treated as having transferred that property
in  exchange  for  annual  payments,"  "[p]eriod,  without
qualification." But TBL omits the sentence immediately following:
"Such person [(i.e., the transferor of the intangible property)]
shall, over the useful life of the property, annually include in
gross income an amount that represents an appropriate arms-length
charge for the use of the property." Id. So the regulation that
TBL says proves its case "without qualification" in fact rests on
the assumption that the transferor of the intangible property must
continue to exist in order to include the annual payments in its
income.

TBL next cites Temp. Treas. Reg. § 1.367(d)-1T(e)(1).
That section provides for the application of a modified version of
the annual-payment rule, rather than the application of the
disposition-payment rule, when a U.S. transferor of intangible
property subsequently transfers the foreign corporation's stock to

a related U.S. person.  In such a scenario, the disposition-payment
rule is not triggered, and the related U.S. person to which the
stock is transferred generally includes the annual payments in its
income.  TBL specifically points to the following language:

> If a U.S. person transfers intangible property
> that is subject to section 367(d) and the
> rules of this section to a foreign corporation
> in an exchange described in section 351 or 361
> and, within the useful life of the transferred
> intangible property, that U.S. transferor
> <u>subsequently transfers</u> the stock of the
> transferee foreign corporation to U.S. persons
> that are related to the transferor . . . ,
> [then the modified annual-payment rule
> applies, rather than the disposition-payment
> rule].

Temp. Treas. Reg. § 1.367(d)-1T(e)(1) (emphasis added by TBL).
TBL also points to  Temp. Treas. Reg. § 1.367(d)-1T(d)(1), which
provides:

> If a U.S. person transfers intangible property
> that is subject to section 367(d) and the
> rules of this section to a foreign corporation
> in an exchange described in section 351 or
> 361, and within the useful life of the
> intangible property that U.S. transferor
> <u>subsequently disposes</u> of the stock of the
> transferee foreign corporation to a person
> that is not a related person . . . , then the
> [the disposition-payment rule applies to the
> U.S. transferor].

Temp. Treas. Reg. § 1.367(d)-1T(d)(1) (emphasis added by TBL).

Analyzing these regulations together, TBL concludes that
"[n]either rule would be necessary, and neither would make any
sense, if the IRS's new position in this case were right."  It is

difficult to see how TBL reaches that conclusion.  TBL emphasizes that both rules are triggered by transactions "subsequent[]" to the "exchange described in section 351 or 361."  But, as already discussed, TBL makes no argument that the "exchange described in section . . . 361" refers to the asset reorganization as a whole, and the fact that the regulations refer to transactions "subsequent[]" to that exchange simply mirrors the structure of the disposition-payment rule.  Further, both rules address scenarios where the U.S. transferor of intangible property transfers the stock of the foreign transferee -- a situation that, obviously, can only arise if the U.S. transferor owns the stock immediately prior to the disposition.  And after an asset reorganization, the U.S. transferor will no longer own the acquiror stock (as a result of the necessary second-step distribution), so there is no way for the U.S. transferor to again dispose of that same stock, as is necessary to trigger both of the regulations TBL points to.  Accordingly, we can easily dispose of TBL's assertion that these regulations rest on some premise that the annual-payment rule must apply after an asset reorganization's completion.

## v.

TBL separately argues that, even if "such transfer" does not refer to the overall asset reorganization, no "disposition" at all occurred when TBL distributed TBL Foreign stock to VF Foreign.

This is so, TBL argues, because the term "disposition" as used in section 367(d) refers only to transfers to unrelated parties, and thus does not apply to a transfer by a wholly owned corporation to its sole shareholder as occurred here.

The statute does not define the term "disposition," but TBL does not dispute that the ordinary meaning of the term is "transferring to the care or possession of another."  See Disposition, Black's Law Dictionary (5th ed. 1979).  Instead, TBL once again hinges its argument on the section 367(d) regulations, asserting that the regulations are premised on the assumption that transfers to related parties are not "dispositions."

And, just as above, TBL's argument that an unstated assumption in the regulations somehow resolves this case in its favor falls flat.  Recall that Temp. Treas. Reg. § 1.367(d)-1T(e)(1) provides for the application of modified annual-payment rules when the "U.S. transferor subsequently transfers the stock of the transferee foreign corporation to U.S. persons that are related to the transferor," Temp. Treas. Reg. § 1.367(d)-1T(e)(1) (emphasis added); and that Temp. Treas. Reg. § 1.367(d)-1T(d)(1) provides that the disposition-payment rule applies when the "U.S. transferor subsequently disposes of the stock of the transferee foreign corporation to a person that is not a related person," Temp. Treas. Reg. § 1.367(d)-1T(d)(1) (emphasis added).  Now add

to the mix Temp. Treas. Reg. § 1.367(d)-1T(e)(3), which provides that if the U.S. transferor "subsequently transfers any of the stock of the transferee foreign corporation <u>to one or more [related] foreign persons</u> . . . , then the U.S. transferor shall continue to" apply the annual-payment rule "as if the subsequent transfer of stock had not occurred." Temp. Treas. Reg. § 1.367(d)-1T(e)(3) (emphasis added).

Putting these regulations together, TBL argues that they "clarify that 'dispositions' are only to unrelated parties." These rules do generally provide that "deemed annual license payments will continue if a transfer is made to a related person, while gain must be recognized immediately if the transfer is to an unrelated person." Temp. Treas. Reg. § 1.367(d)-1T(a) (addressing the purpose and scope of the regulations). But nothing indicates that the reason the regulations so provide is because of a narrow meaning of the word "disposition" in the statute.

TBL cites the title of Temp. Treas. Reg. § 1.367(d)-1T(e)(3) -- "Transfer to related foreign person not treated as disposition of intangible property" -- as support for its position. The title, however, is perfectly consistent with the general definition of "disposition." Although transfers to related persons are dispositions under the statute, certain transfers made

- 48 -

to foreign related persons are not "treated as" dispositions under the regulations.

Temp. Treas. Reg. § 1.367(d)-1T(f) further undermines TBL's argument that the regulations are premised on a narrow definition of "disposition." That regulation addresses what happens when a foreign corporation directly transfers the intangible property it received from the U.S. transferor. In setting out those rules, the regulation refers to a "transferee foreign corporation's subsequent disposition of the transferred intangible property to a related person." Temp. Treas. Reg. § 1.367(d)-1T(f)(3) (emphasis added). Clearly, simply because the transfer is to a "related person" does not preclude the transfer from being described as a "disposition."

Temp. Treas. Reg. § 1.367(d)-1T(a), which describes the purpose and scope of the section 367(d) regulations, reinforces this point. That section provides: "Paragraphs (d), (e), and (f) of this section provide rules for cases in which there is a later direct or indirect disposition of the intangible property transferred. In general, deemed annual license payments will continue if a transfer is made to a related person, while gain must be recognized immediately if the transfer is to an unrelated person." Temp. Treas. Reg. § 1.367(d)-1T(a) (emphasis added). Thus, in describing a set of provisions that address transfers to

both related and unrelated parties, the regulation sums them up as addressing "cases in which there is a later direct or indirect <u>disposition</u> of the intangible property transferred." <u>Id.</u> (emphasis added). This description leaves little room for TBL's argument that the regulations described in this section are premised on the assumption that "disposition" as used in section 367(d) refers only to transfers to unrelated parties.[20]

## VI.

Finding nothing in that statute that would absolve TBL of its responsibility under the disposition-payment rule, we <u>affirm</u> the judgment of the Tax Court.

---

[20] TBL also argues that the Commissioner's reading of "disposition" cannot be right because, if it was, then the regulations would impermissibly defy the statute and would thus be outside the scope of the Treasury Department's regulatory authority. This is so, TBL argues, because the regulations allow for the continued use of the annual-payment rule following a "disposition" to a related party, even though the statute, under the Commissioner's reading, requires use of the disposition-payment rule. But we need not address the scope of Treasury's authority in order to put paid to TBL's argument that the regulations rest on the assumption that a "disposition" encompasses only transfers to unrelated parties. Rather, it is sufficient for us to simply say, as we have said above, that the regulations on their face demonstrate no such assumption and, in fact, point in the exact opposite direction.